[No. 33260. Department One. April 19, 1956.]

MOLLY LAKODUK, *as Administratrix, Respondent*, v. MELVIN G. CRUGER *et al., Appellants*.

MOLLY LAKODUK, *Respondent*, v. MELVIN G. CRUGER *et al., Appellants*.

EVELYN M. MILLER, *as Administratrix, Respondent*, v. MELVIN G. CRUGER *et al., Appellants*.[1]

[1]Reported in 296 P. (2d) 690.

*Del Cary Smith* and *Randall, Danskin & Lundin* (*Paul J. Allison*, of counsel), for appellants.

*Tonkoff, Holst & Hopp* and *Kimball & Clark*, for respondents.

DONWORTH, J.—The three cases which are the subject of this appeal arose out of the same automobile collision which occurred at approximately two o'clock p. m. on February 2, 1953, at the intersection of Division street and Wellesley avenue, in Spokane. The vehicles involved were a Kenworth triple combination hose wagon (hereinafter referred to as the hose wagon), which was a part of the city's regular fire department equipment, and a farm truck with a pickup body. All three occupants of the farm truck were killed, and actions for wrongful death were commenced by their respective administratrices against three defendants: the city of Spokane, the driver of the hose wagon, Melvin G. Cruger, and the fire captain in charge thereof, Robert Beck.

The city of Spokane was dismissed from the action prior to the trial, after its demurrers to the complaints had been sustained. We affirmed that dismissal upon the ground that, in the maintenance and operation of the fire department, the city was engaged in the performance of a govern-

mental function, and that the purpose for which the emergency run was made was a part of the duties of the fire department. *Lakoduk v. Cruger,* 47 Wn. (2d) 286, 287 P. (2d) 338.

Molly Lakoduk, as administratrix, brought two actions: One on account of the death of her husband and for the destruction of their farm truck, and the other on account of the death of her thirteen-year-old daughter. Evelyn Miller, as administratrix, brought an action against the same defendants on account of the death of her husband, Robert Miller. The three actions were consolidated for trial, which was had before the court and a jury, and resulted in a verdict in favor of the two defendants in each of the three cases. In each case, the plaintiff's motion for a new trial was granted. The defendants have appealed from the order granting a new trial and in each case assign as error only the granting of a new trial. However, the reasons stated by the trial court in its order granting a new trial raise many complex and difficult questions of law.

For convenience, we shall refer to the two administratrices as respondents, and the two firemen as appellants.

The facts relating to this tragic accident, which for the most part are not disputed, may be stated as follows:

Wellesley avenue is a two-lane highway which runs east and west. Division street is a four-lane arterial highway which runs north and south and intersects Wellesley avenue at right angles. Fire station No. 13 is located on Wellesley about eleven blocks west of Division. The destination of the fire apparatus was a house on east Broad avenue, which was located some five blocks east of Division street and one block north of Wellesley avenue.

The trip was made in response to a telephone call received at the headquarters of the fire department to the effect that a two-year old boy had locked himself in the bathroom and that his grandmother needed assistance in rescuing him.

The call was relayed to fire station No. 13. Appellant Beck ordered his crew to "man" the hose wagon and proceed under emergency conditions. Appellant Cruger was

driving the apparatus, which proceeded east from the station on Wellesley at speeds ranging from thirty to forty miles per hour. Appellant Beck, who was in command of the operation, was sitting on the right, beside the driver. He had the red flashing lights operating and was continuously sounding the siren as required of an emergency vehicle.

As the hose wagon crossed Atlantic street, which is one block west of Division, the traffic light at Division street changed from green to amber and thence red for traffic traveling east and west; green for traffic north and south bound on Division. Appellants both testified that Cruger allowed the hose wagon to coast to Division street from Atlantic, thereby reducing its speed to twenty-five or thirty miles per hour. Some witnesses estimated its speed at from thirty to forty miles per hour as it approached the intersection.

Appellants testified that they observed some six cars facing the intersection which were stopped and appeared to be holding their positions. Appellant Cruger then accelerated his motor at a point approximately thirty feet west of the west pedestrian crosswalk at Division and entered the intersection. At the same time, the farm truck driven by Peter J. Lakoduk, which was northbound on Division street, having the green light in its favor, entered the intersection from the south, the manner and speed at which the latter entered the intersection being a matter of dispute. It is undisputed that the collision took place in the southeast quadrant of the intersection. The fire apparatus struck the farm truck at the cab broadside. As stated above, the resulting collision killed all three occupants of the farm truck: Peter J. Lakoduk, his minor daughter, Patricia Lakoduk, and the other passenger, Robert Miller.

Fourteen disinterested witnesses were called, and without exception each testified that he had heard the siren as the fire apparatus was approaching the intersection. The condition of the roadway was wet, since a slow drizzling rain was falling. Witnesses who were seated in six of the eight automobiles which were stopped at the intersection

testified that they had their windows up, windshield wipers operating, and some had their radios operating; nevertheless, each witness heard the siren either as he was approaching the intersection or had stopped there. Some of these witnesses had heard it when two or three blocks away. Other witnesses, who were at the time inside business establishments located within one block of the intersection, testified that they heard the siren while the hose wagon was a block or more away. All witnesses who were in a position to see testified that the red lights on the hose wagon were continuously flashing.

Just prior to the collision, the Lakoduk truck was traveling north in the outside lane of traffic on the east side of Division, and came up beside three cars which were stopped at the intersection in the inside lane. At least two witnesses, Jack MacDonald and Earl Riese, both of whom were following behind the farm truck, testified that it had stopped before entering the intersection. Mr. MacDonald stated that he definitely saw the red stop lights function on the farm truck as it slowed and stopped. His was the second car which had stopped in the inside lane on Division facing north. Mr. Riese was traveling north in the outside lane and had stopped directly behind the farm truck. Other witnesses were not certain as to whether or not the farm truck had stopped or merely "hesitated," and still others estimated that it was moving at from five to fifteen miles per hour as it approached the intersection.

The block southwest of the Wellesley-Division intersection, bounded by Division on the east and Wellesley on the north, is level with the streets. The only building in the block at the time of the accident was a Union service station, which was located some sixty feet southwest of the intersection.

Appellants both testified that, as they crossed Atlantic street traveling east on Wellesley, they had seen the farm truck proceeding north on Division when it was approximately two thirds of a block south of the intersection, but that, as they approached the west crosswalk on Division,

all traffic was "holding its position." Appellants Cruger and Beck both stated that the first knowledge they had that the farm truck was not holding its position was the instant that it proceeded out into the intersection in front of the hose wagon when the latter was about twenty-five feet from the point of impact. Appellant Cruger stated that he "went for the brakes," but that the vehicles collided as he did so, throwing his foot off the brake pedal.

A Spokane police officer, who investigated the accident, testified that neither vehicle left visible skid marks as the result of braking. He further testified that, from measurements taken, and from a side skid mark made by one of the tires of the farm truck, it was his opinion that the point of impact was seven feet north of the south curb line of Wellesley and one and one-half feet west of the east curb line of Division. There was testimony that the front of the farm truck had reached the center line of Wellesley.

The wooden pickup body was torn from the farm truck and came to rest ninety-six feet east of the point of collision. The dual wheels, also torn from the pickup truck, came to rest some distance further than the wooden body. The two trucks became locked together as a result of the collision and continued some one hundred fifty-nine feet in a northeasterly direction, coming to rest in Albertson's parking lot, which is located on the northeast corner of the intersection.

Respondents alleged in their amended complaints that appellants were operating a fire engine in the scope of their authority; that appellants, Beck and Cruger, were negligent in the following particulars:

"1. In entering an intersection when the traffic control light showed red;

2. In entering said intersection of the city street and State highway within the incorporated limits of the City of Spokane at a speed in excess of 25 miles per hour;

3. In entering said intersection when there was other traffic thereon and entering from the right;

4. In entering said intersection without having the vehicle operated by them under control;

5. In approaching and entering said intersection and operating said vehicle without the exercise of due care and caution under

> the circumstances, consisting of the fact that the same was a busy intersection and that it was then occupied by another vehicle, that in which plaintiff's decedent . . . was riding."

Appellants, in their answer, denied the allegations of negligence and pleaded the following affirmative defenses:

1. The enactment of ordinance No. C6072 of the city of Spokane passed by the city council December 18, 1939, as amended, relating to and regulating traffic and travel and their incidents upon the streets, avenues, and public highways of the city of Spokane.

The applicable sections of the city ordinance pleaded are substantially in the language of the statutory provisions relating to the operation of emergency vehicles. The latter read as follows:

" 'Authorized Emergency Vehicle' means any vehicle of any fire department, police department, sheriff's office, coroner, prosecuting attorney, Washington state patrol, ambulance service, public or private, or any other vehicle authorized in writing by the state commission on equipment." RCW 46.04.040.

"The provisions of this title relating to the operation of vehicles upon the public highways of this state shall not apply:

"(1) To any authorized emergency vehicle properly equipped as required by law and *actually responding to an emergency call* or in immediate pursuit of an actual or suspected violator of the law, *within the purpose for which such emergency vehicle has been authorized,* but this shall not relieve the operator of an authorized emergency vehicle of the duty to operate with due regard for the safety of all persons using the public highway, nor shall it protect the operator of any such emergency vehicle from the consequences of a reckless disregard for the safety of others: *Provided,* That the provisions of this section shall in no event extend any special privilege or immunity to operate an authorized emergency vehicle *for any purpose other than that for which it has been authorized.* . . .

"(3) To any persons or vehicles, insofar as they may be specifically exempted from any provision or provisions of this title." (Italics ours.) RCW 46.08.050.

"Immediately upon the approach of an authorized emergency vehicle, when the driver is giving audible signal by siren, ·exhaust whistle, or bell, the driver of every other

vehicle shall yield the right of way and shall immediately drive to a position parallel to, and as close as possible to, the right hand edge or curb of the public highway clear of any intersection and shall stop and remain in such position until the authorized emergency vehicle has passed, except when otherwise directed by a peace officer. Upon such approach of an authorized emergency vehicle, street cars shall be stopped unless otherwise directed by a peace officer. When the operator of a vehicle is complying with the provisions of this section, he shall give proper hand signal indicating his intended movement." RCW 46.60.210.

As part of their first affirmative defense, appellants further alleged that:

"In thus operating the said fire truck these defendants were actually responding to an emergency call by which they had been advised that a child of tender years was locked inside a bathroom in a private residence and was unable to extricate himself therefrom, and that there were no other persons present in that residence who were able to get the child out of the bathroom."

2. Decedents, Robert D. Miller and Peter J. Lakoduk, were engaged in a joint adventure, and Lakoduk, the driver of the farm truck, did not yield the right of way to the said fire truck in violation of city ordinance, and was therefore guilty of negligence which proximately caused the collision in that he negligently failed to heed the warning lights and siren.

3. The driver of the farm truck was guilty of negligence proximately causing the collision, since he passed to the right of vehicles which were stopped in the inside lane of traffic on Division, which is in violation of city ordinance.

4. That each of the three decedents was guilty of negligence, which contributed proximately to the collision resulting in the death of each.

Upon the issues thus joined, the causes proceeded to trial. Following the verdicts in favor of the defendants, the trial court granted respondents' motions for a new trial by entering the following order:

"The above matter came on for hearing on the 17th day of December, 1954, upon Plaintiffs' Motion for Judgment Not-

withstanding the Verdict on an Alternative for New Trial, and respective counsel appeared and argued before the above-entitled court, and the court having rendered an oral decision, and

"It Appearing to the court that its instructions in the cases of Mollie Lakoduk v. Melvin G. Cruger and Robert Beck, Defendants, Case #136509, and Evelyn M. Miller v. Melvin G. Cruger and Robert Beck, Defendants, Case #136510, were preemptory [sic] instructions to the jury to bring in verdict for the plaintiffs, and the jury disregarded said instructions and brought in a verdict for the Defendants in said cases, and

"It Appearing to the court that it erroneously instructed the jury by the giving of Instruction No. 6, particularly Paragraph 4 of said instruction which refers to the contributory negligence of the driver of the Chevrolet farm truck in the case of Mollie Lakoduk, as administratrix of her deceased husband's estate v. Melvin G. Cruger and Robert Beck, defendants, Case #136508, for the reason that the defendants were guilty of negligence as a matter of law in failing to stop at the red light at the intersection when the farm truck driven by the deceased, Peter J. Lakoduk, was visible or could have been seen by the defendants, and

"It Appearing to the court that the defendants violated the City Ordinance which is in the language of R.C.W. 46-.08.050 for the reason that at the time of the operation of the fire truck which was operated by the defendants, was not being used as an authorized emergency vehicle under said ordinance and statute and that any immunity given to the defendant operators of said fire truck does not in any event permit them to disregard the rights of others using the highway or streets, and

"It Further Appearing to the court that Instruction No. 4 is inconsistent and improper and should not have been given for the reason that the fire truck was not being operated as an emergency vehicle, and

"It Further Appearing that plaintiffs' requested Instruction No. 8 on wanton misconduct should have been given in accordance with the ruling of this court and upon the authority of *Adkisson v. Seattle*, 42 Wn. (2d) 676,

"Now, Therefore, It is By the Court Ordered, Adjudged and Decreed that the plaintiffs' motion for a judgment notwithstanding the verdict be and the same is hereby denied in each of the above cases, and

"It is Further By the Court Ordered that plaintiffs' mo-

tion for a new trial, be and the same is hereby granted in each of the above cases, for the reason:

"(1) The court erred in the giving of Instruction No. 6 in the form in which it did.

"(2) The court erred in the giving of Instruction No. 4.

"(3) The court erred in failing to give plaintiffs' requested Instruction No. 8.

"(4) That as a matter of law there is no negligence which may be imputed on the part of the occupants of the truck in the case of Mollie Lakoduk v. Cruger and Beck, Case #136509 and in the case of Evelyn M. Miller v. Cruger and Beck, Case No. 136510, and the negligence on the part of the defendants, as a matter of law, is the proximate cause of the accident, and that substantial justice has not been done.

"(5) That the jury was guilty of misconduct in refusing to follow the court's instructions, and particularly in the case of Mollie Lakoduk v. Cruger and Beck, Case No. 136509 and in the case of Evelyn M. Miller v. Cruger and Beck, Case No. 136510."

Appellants' only assignment of error in each case is that the trial court erred in granting the motion for new trial. We shall now consider the reasons recited in its order to determine whether they afford a legally sufficient basis for granting a new trial.

The trial court did not give definite reasons, as required by superior court Rule 16, 34A Wn. (2d) 117, for holding that substantial justice had not been done. The last sentence of paragraph (4) of the order, whether intended as a summary of the other reasons therein or as a reason in itself, is not a sufficient reason for granting the new trial. *Mulka v. Keyes*, 41 Wn. (2d) 427, 249 P. (2d) 972.

In paragraph (2) of the order, the trial court states that instruction 4 should not have been given for the reasons (unnumbered paragraphs 4 and 5) that the defendants violated RCW 46.08.050, since the fire apparatus was not being used as an authorized emergency vehicle, and that the instruction is inconsistent and improper for the reason that the apparatus was not being operated as an emergency vehicle. There is no doubt that this instruction was inconsistent in so far as it instructed that both parties had

the right of way. This matter is discussed later in this opinion.

Through the enactment of the Washington motor vehicle act (chapter 189, Laws of 1937, p. 835, as amended), the applicable provisions of which are quoted *supra*, the legislature has declared it to be the express public policy of this state that a clear and speedy pathway shall be provided for the operation of emergency vehicles when actually responding to an emergency call. *Lucas v. Los Angeles*, 10 Cal. (2d) 476, 75 P. (2d) 599; *State of Washington v. United States*, 194 F. (2d) 38.

Whether the policy expressed therein is wise or not is a question exclusively within the legislative prerogative, and cannot be considered or determined by the court. *Lucas v. Los Angeles, supra.*

We further note that neither party here has cited a Washington case in which this court has been called upon to interpret the "emergency vehicle statutes" in a similar factual situation, nor have we been able to find one.

Our statute (RCW 46.08.050) exempts authorized emergency vehicles, upon specified conditions, from complying with certain provisions of the Washington motor vehicle act, such as the maximum speed limits, the rule requiring that the driver of a vehicle approaching an intersection shall yield the right of way to a vehicle simultaneously approaching the intersection from his right, and the rule requiring that vehicles shall stop at any intersection which exhibits a stop sign or is controlled by traffic control signals exhibiting a red light.

The fire apparatus operated by appellants at the time of the collision was conceded to be an authorized emergency vehicle (RCW 46.04.040) properly equipped as required by law (RCW 46.08.050). The latter statutory provision requires that the vehicle be ". . . actually responding to an emergency call . . . *within the purpose for which such emergency vehicle has been authorized,* . . ." (Italics ours) in order to be exempt from the traffic laws applicable to ordinary vehicles. We conclude that the

legislature intended these italicized words to refer solely to the authorization of the state commission on equipment.

As applied to this case, the italicized language means that the emergency call must be for a fire department purpose, since the commission on equipment granted permission to install emergency equipment (warning devices) on this particular vehicle because it was owned and operated by a municipal fire department.

When equipped as authorized by the commission, the vehicle *may carry* the warning devices and is an "authorized emergency vehicle," but the statute (RCW 46.04-.040) does not purport to specify under what conditions these warning devices *may be used*. Neither does RCW 46-.08.050 purport to specify who shall decide in a particular instance whether or not the warning devices shall be used, but a reasonable interpretation of the language appears to us to be that this decision shall be made by the person in charge of the vehicle, in this case Captain Beck.

Here, the fire apparatus was actually responding to an emergency call within the purpose for which it had been authorized as an emergency vehicle within the contemplation of the statute. That the purpose of the call was part of the duties of the fire department, was held by this court in the first *Lakoduk* case, *supra*, where we said:

"The function being performed in the instant case was not that of responding to a call to extinguish a fire. However, it was a function which, because of the available equipment of the fire department and the special training of the firemen in the performance of first-aid duties, was reasonably incident and appropriate to, and a part of, the duties of a fire department."

Therefore, the claimed error in instruction No. 4 was not prejudicial to respondents. That instruction correctly stated that the fire apparatus was being operated as an authorized emergency vehicle. However, it did erroneously instruct the jury that appellants were not entitled to exemption from obedience to ordinary traffic laws because the apparatus was not being used for an authorized purpose. That error was likewise not prejudicial to respondents

and could not support the order granting them the new trials.

In fairness to the trial court, it should be pointed out that our decision in the first *Lakoduk* case had not been announced when the present cases were tried.

Respondents cite *Tiedebohl v. Springer,* 55 N. M. 295, 232 P. (2d) 694, to support their contention that no authority for the mission in the present case can be found in our statutes. There, a fire truck, while going to a private home on an inhalator call, collided with an automobile at an intersection. The defendant firemen unsuccessfully claimed exemption under the New Mexico statutes. The case is not in point for two reasons: First, there was a conflict in the evidence as to whether the plaintiff heard the siren; second, the statutes exempted fire department vehicles when responding to a fire alarm and provided that other drivers upon the highways should yield the right of way to fire department vehicles when "operated upon official business." The court held that the " . . . only official business designated by the legislature is that of responding to a fire alarm, or police call."

Our statute does not limit the exemption to any specified type of emergency call, but requires that the vehicle be actually responding to an emergency call within the purpose for which it is authorized to carry emergency warning devices. If the legislature had intended to limit the use of fire department vehicles to use in responding to fire calls or false fire alarms, we would reasonably expect to find specific language in the statute to that effect. The only requirement which the legislature prescribed is that the vehicle be responding to an *emergency call* within the duties of the fire department.

Respondents also cite *Anderson v. Finzel,* 204 Ore. 162, 282 P. (2d) 358. In that case, the plaintiff sheriff, while on an emergency call, collided with a private automobile. As in this case, the emergency vehicle had gone through a red light. The Oregon statute did *not* grant an exemption to go through red lights but merely to exceed the speed limit. Accordingly, the Oregon court held that failure of the sher-

iff to stop at the intersection constituted contributory negligence, barring his recovery.

The Washington case of *Groves v. Meyers*, 35 Wn. (2d) 403, 213 P. (2d) 483, cited by respondents, is not an emergency vehicle case. It does involve subsection (2) of RCW 46.08.050, *supra*, which relates to highway maintenance department vehicles, where certain provisions of the Washington motor vehicle act are suspended as necessary for highway maintenance work. However, this court held that the operator of the highway maintenance truck, there involved in a collision, was prohibited by law from using flashing red lights on the truck to avoid liability, since, had he done so, he would have violated a statute. Rem. Supp. 1947, § 6360-29, subsequently amended, RCW 46.40.170.

But in subdivision (1) of RCW 46.08.050, *supra*, emergency vehicles are exempt from obeying the rules of the road when actually responding to an emergency call within the purpose for which such emergency vehicle has been authorized. We have already held that, under the first subdivision of the statute, Captain Beck had the power to decide whether or not to respond to this call with the use of emergency warning devices, and that the mission upon which he embarked was within the purpose for which the vehicle had been authorized to carry such devices. *Lakoduk v. Cruger, supra.*

In the *Groves* case, the driver of the highway maintenance truck was given no statutory authority to use flashing red lights. Thus the two cases involve essentially dissimilar problems. The *Groves* case cannot be considered as supporting respondents' position in this case.

When an "authorized emergency vehicle" is actually responding to an emergency call, the operator must use the emergency warning devices in order to be exempt from obedience to ordinary traffic laws. Here, the evidence was uncontradicted that these warning devices were constantly being used prior to the accident.

The test for determining whether a publicly owned motor vehicle is at a given time responding to an emergency call

". . . is not whether an emergency in fact exists at that time but rather whether the vehicle is then being used in responding to an emergency call. Whether the vehicle is being so used depends upon the nature of the call that is received and the situation as then presented to the mind of the driver. (*Head v. Wilson*, 36 Cal. App. (2d) 244 [97 Pac. (2d) 509].)" *Coltman v. Beverly Hills*, 40 Cal. App. (2d) 570, 105 P. (2d) 153.

See, also, *Gallup v. Sparks-Mundo Engineering Co.*, 43 Cal. (2d) 1, 271 P. (2d) 34.

▆▆▆ Although Captain Beck was not the driver in this case, he was in command of the operation and made the decision to respond to the call with the use of the emergency equipment. This decision was made by him in the line of his duty as a public officer engaged in carrying out the functions of the municipal fire department. *Johnson v. Pease*, 126 Wash. 163, 217 Pac. 1005; *Benefiel v. Eagle Brass Foundry*, 154 Wash. 330, 282 Pac. 213.

It is argued on behalf of respondents that Captain Beck did not know whether there was any immediate danger to the child locked in the bathroom, and that the woman making the telephone call was not "excited." This, as we view it, is immaterial. As held in the California cases above cited, it is necessary to consider only the nature of the call as it was reported to Captain Beck at fire station No. 13.

Unless the evidence showed that Captain Beck, in making this decision, acted arbitrarily or from some motive not connected with his official duties, his decision to make this run with the use of the emergency warning devices would not render him liable for damages resulting from the collision.

▆▆▆ The general rule is stated in 31 C. J. S. 798, § 146, as follows:

"Official acts or duties are, in the absence of evidence to the contrary, presumed to have been properly performed; and, as a general rule, it is presumed that a public official discharges his duty or performs an act required by law in accordance with the law and the authority conferred upon him, and that he acts fairly, impartially, and in good faith."

It appears in the record that George C. Caughey, the alarm operator for the Spokane fire department, first received the call. He testified as follows:

"Q. Just tell what that call was? A. Well, she called over the phone, and I answered, 'Fire Department', and she said, 'Would you please send me some help out here? I have a small child locked in the bathroom and I can't get him out,' so I asked her address and asked her if it was on the ground floor or the second floor, and she said it was on the ground floor, and I turned around to the boy— . . . Q. What did you do after receiving that call? A. I turned around to my assistant and told him to call No. 10 and send them over there, that there was a child locked in the bathroom. Q. Who was your assistant? A. Clarence Showwalter. . . . Q. All right, what did he say? A. Well, we have an alarm switchboard, and he plugged in No. 10, which was stationed in No. 13 house, and he called in, and whoever answered the phone at No. 13, he told them to take No. 10 wagon and go to such and such an address on Broad, that there was a child locked in the bathroom. Q. What do firemen refer to when they refer to 'the wagon'? A. Combination hose wagon, a pumper and booster tank, a small ladder is on it, and the hook and ladder is a truck. Q. In connection with the operation of the fire department, whose duty was it, at Station No. 13, to execute that order? A. The captain on the rig that was to respond to it, he was in charge of the rig. I don't know who was in charge of the station, but there was a captain, one of the captains there. There was two captains there, and the senior captain was the man in charge of the station. Q. What was his duty after receiving that call? A. Well, if he answered, and it was his rig to go, he was to get going."

Appellant Beck testified when called as an adverse witness by respondents as follows:

"Q. The outfit was under your supervision? A. Yes. Q. You were supervising the driving? A. No, I was handling the siren. If he weren't driving properly it would be my duty to caution him in some manner. Q. You were in control. In other words, you could direct his driving? A. Yes, I was the officer in charge. Q. The purpose of the call was to go over and unlock a bathroom, and let a child out, is that right? A. Yes. Q. You knew that before you left there? A. Yes, that was the nature of the call."

Appellant Beck testified on direct examination as follows:

"Q. Well, just tell us what information you got with reference to this call. MR. TONKOFF: I object to it as hearsay. THE COURT: The objection will be sustained as hearsay. BY MR. RANDALL: Q. Mr. Beck, did you get the call from a member of the fire department? A. I did. Q. Do you know who it was? A. I say I do, but there is a disagreement on that, and I might be wrong. Q. Did the call come into the station in the regular order of business of the fire department? A. Yes. Q. Was it transmitted to you in the usual manner, when you were not at the phone? A. Yes, it was. Q. Has that been the practice of the fire department since you have been on there, that whoever received the call, calls it out to those present? A. Yes. Q. Was this call, called out in that manner? A. Yes. Q. You received it from the man who took it over the phone? A. Yes, that is right. Q. Now, what was that call? MR. TONKOFF: This doesn't change the rules of evidence your Honor. THE COURT: The objection is sustained. Counsel approach the bench, please."

It thus appears that Captain Beck was not allowed to testify as to the communication made to him by the person receiving the telephone call at station No. 13, the objection of hearsay having been sustained. In a similar situation, the California court, in *Head v. Wilson, supra,* stated that:

"In determining whether this publicly owned ambulance was at the time in question being used in responding to an emergency call it is not only material, but essential, to consider such facts as disclose the nature of the call which was being answered. This involves both a statement of the substance of the call as it came in to the hospital and the substance or terms of the call as communicated to the driver of the ambulance. The testimony of the doctor with respect to the call he made over the telephone was stricken out on the ground that it was hearsay. The fact sought to be established was that certain words were spoken and not the truth or falsity of those words. It made no difference in this case whether or not the doctor was correct in his diagnosis or whether or not an acute case of appendicitis actually existed which required immediate treatment. The essential thing was the call that was made and acted upon by the appellant's employee. The form in which the call was made was material evidence and not subject to the objection made. . . . While the controlling thing is the nature of the call as it was communicated to the driver of

the ambulance, this may well have been affected by the nature of the call as received. What was said in making the call may have had a bearing upon whether it was an emergency call, and also upon the question of whether the nature of the call was communicated to the driver of the ambulance."

In the present case, there was no evidence offered to overcome the presumption that Captain Beck, as an officer of the Spokane fire department, made his decision to operate the hose wagon under emergency conditions in good faith. The burden was upon respondents to show that he had acted arbitrarily in so deciding. Respondents did not attempt to prove that Captain Beck's decision was arbitrary upon the facts as stated to him, but merely attempted to show that his decision was improper in the light of facts which were immaterial and which were never communicated to him.

The fourth unnumbered paragraph of the trial court's order further states that the immunity given to the operator of the fire truck by RCW 46.08.050, does not in any event permit him to disregard the rights of others using the highways or streets.

The decision in *Lucas v. Los Angeles*, *supra*, based on statutes somewhat similar to ours, and followed by numerous other California decisions, states the law relating to the duty of the operator of an emergency vehicle with respect to other users of the highways as follows:

"The expression 'with due regard for the safety' of all persons using the highway was explained in the Balthasar case where the court said (p. 311): 'It is evident that the right of way of fire apparatus over other vehicles is dependent upon "due regard to the safety of the public" only in so far as such "due regard" affects the person required to yield the right of way. Notice to the person required to yield the right of way is essential, and a reasonable opportunity to stop or otherwise yield the right of way necessary in order to charge a person with the obligation fixed by law to give precedence to the fire apparatus.' *This is the only reasonable interpretation that the statute will bear.* If the driver of an emergency vehicle is at all times required to drive with due regard for the safety of the public *as all*

*other drivers are required to do*, then all the provisions of these statutes relating to emergency vehicles become meaningless and no privileges are granted to them. But if his 'due regard' for the safety of others means that he should, *by suitable warning, give others a reasonable opportunity to yield the right of way*, the statutes become workable for the purposes intended." (Italics ours.)

See, also, *State of Washington v. United States*, 194 F. (2d) 38; *Duff v. Schaefer Ambulance Service*, 132 Cal. App. (2d) 655, 283 P. (2d) 91; *Seattle v. Lough*, 45 Wn. (2d) 286, 273 P. (2d) 984.

The last cited case is distinguishable from the present one, since in that case none of the persons at or near the point of the collision had heard the siren.

In *Duff v. Schaefer Ambulance Service, supra* (decided in May, 1955), the court, in discussing the "due regard" clause in the California statute, said:

"The court gave to the jury BAJI 215-A which relates to the exemption, and its limitations, accorded the driver of an emergency vehicle by section 454. That instruction, while it does not specifically employ the phrase italicized *supra*, is so worded as to embody accurately the restricted significance attributed to the words 'due regard' as interpreted in the context of that section. (*Reed v. Simpson*, 32 Cal. 2d 444, 449 [196 P. 2d 895]; *Lucas v. City of Los Angeles*, 10 Cal. 2d 476, 483 [75 P. 2d 599]; *Goldstein v. Rogers*, 93 Cal. App. 2d 201, 208 [208 P. 2d 719].) The cases last cited, as well as such cases as *Raynor v. City of Arcata*, 11 Cal. 2d 113, 117 [77 P. 2d 1054]; *Head v. Wilson*, 36 Cal. App. 2d 244, 247 [97 P. 2d 509], and *Stone v. San Francisco*, 27 Cal. App. 2d 34, 39 [80 P. 2d 175], have firmly established the proposition that the 'due regard' phrase is essentially satisfied (1) when the driver of the emergency vehicle has, by suitable warning, given the users of the highway an opportunity to yield the right of way, and '(2) if, having discovered the peril in which another has unknowingly or negligently become involved despite the operation of the required warning devices, the driver reasonably exercises any last clear chance to avoid the accident. Such an interpretation prevents an emasculation of the legislative intent. This is cogently pointed out in *Reed v. Simpson, supra*: 'Defendants then argue that even though the trial court did commit error in its instruction embracing such improper

statement of the law, that circumstance cannot avail plaintiffs because the decedent did not operate his motorcycle "with due regard for the safety of all persons using the highway," as required by the statute. But, as plaintiffs maintain, such duty does not impose the same quantum of care upon the driver of an emergency vehicle as upon motorists generally, for in that event the requirement would have the absurd result of practically nullifying the traffic exemptions expressly granted by the section. So pertinent is the interpretation of the phrase in *Lucas v. City of Los Angeles*, 10 Cal. 2d 476, where it was said at page 483 [75 P. 2d 599]: "If the driver of an emergency vehicle is at all times required to drive with due regard for the safety of the public as all other drivers are required to do, then all the provisions of these statutes relating to emergency vehicles become meaningless and no privileges are granted to them. *But if his 'due regard' for the safety of others means that he should, by suitable warning, give others a reasonable opportunity to yield the right of way, the statutes become workable for the purposes intended.*" And while the statute does not "protect [the] driver from the consequences of an arbitrary exercise of the privileges" there granted, *"an arbitrary exercise" of them "cannot be predicated upon the elements of speed and failure to observe other rules of the road where a warning has been given."* . . . "In such cases speed, right of way, and all other 'rules of the road' are out of the picture." (Emphasis added.) In *Goldstein v. Rogers, supra,* it was held prejudicial error to instruct on section 454 without qualifying instructions explaining the restricted meaning to be ascribed to the 'due regard' language of that section. The court obviated this by giving the BAJI instruction fully encompassing the subject with scrupulous regard to the tenor of the judicial decisions defining and clarifying the 'due regard' phrase. (*Reed v. Simpson, supra; Lucas v. City of Los Angeles, supra; Goldstein v. Rogers, supra.*)"

We recognize that the California statute creates municipal liability for the negligence of municipal officers and employees in the operation of public vehicles, but that difference does not affect the applicability of the California cases cited herein to the problem involved in this case.

In the case at bar, there is no conflict in the evidence relative to the use of the red lights and the continuous sounding of the siren with which the hose wagon was equipped.

Fourteen disinterested witnesses heard the siren when at various points in the vicinity of the intersection, some of them at a greater distance from the approaching fire apparatus than was the farm truck. The conclusion seems irresistible that Mr. Lakoduk either did hear the siren but failed to heed the warning, or, in the exercise of reasonable care, should have heard it. *Holser v. Midland,* 330 Mich. 581, 48 N. W. (2d) 208.

The deceased driver of the farm truck, under the provisions of RCW 46.60.210, was required, upon hearing the siren, to yield the right of way by driving to the right curb, stopping, and remaining there until the emergency vehicle had passed, when (1) the "authorized emergency vehicle" was approaching and (2) was giving audible signal by siren. This statute is unambiguous. Since appellants had red lights on their vehicle flashing and were giving the required audible signal, the deceased driver will be deemed to have seen and heard that which was there to be seen and heard by a reasonably prudent driver exercising due care for his own safety. Under the provisions of this statute, it became the mandatory duty of the deceased driver to yield the right of way. He failed to obey the mandate of the statute. It must therefore be held, as a matter of law, that his failure to do so was negligence, which was a proximate cause of the accident.

Instruction No. 4 was inconsistent, inasmuch as it, in effect, told the jury that the operators of both vehicles were under a duty to yield the right of way. However, under instruction No. 6, the jury was allowed to determine which of the operators was negligent. Since we have decided, as a matter of law, that appellants were not negligent under the provisions of the applicable statutes, there was no question for the jury to pass upon. The error in instructions 4 and 6, therefore, was prejudicial only to appellants, and paragraphs 1 and 2 of the order appealed do not state sufficient reasons for granting the new trials.

In paragraph 3 of the order, the trial court states that error was committed in failing to give plaintiffs' requested instruction No. 8, which relates to wanton miscon-

duct, upon the authority of *Adkisson v. Seattle*, 42 Wn. (2d) 676, 258 P. (2d) 461. Wanton misconduct may arise under that portion of the statute (RCW 46.08.050) which provides:

" . . . nor shall it [exemption from compliance with rules of the road] protect the operator of any such emergency vehicle from the consequences of a reckless disregard for the safety of others: . . ."

However, the operator of an authorized emergency vehicle, while upon an emergency call, has the right to proceed upon the assumption that, when the required signal by siren is given, other users of the highway will yield the right of way. This is true whether he has observed other vehicles approaching the intersection or not. See *Gilpin v. United States*, 120 F. Supp. 812 (Wash. 1954); *State of Washington v. United States*, 194 F. (2d) 38 (C. A. 9, 1952).

Appellants testified that it appeared that all traffic was holding its position when the hose wagon entered the intersection. Whether Mr. Lakoduk had stopped or not before proceeding into the intersection, is immaterial. Appellants did not see that the farm truck was not going to accord the hose wagon the right of way until the farm truck actually entered the intersection and was about twenty-five feet directly in front of the hose wagon. It affirmatively appears by undisputed evidence that, at that moment, there was not appreciable time for appellants to avert the certain disaster which inevitably followed. There is, therefore, no evidence in this case which could give rise to the application of that part of the statute above quoted relating to wanton misconduct. Consequently, paragraph 3 of the order does not state a sufficient reason for ordering the new trials.

Paragraph 4 of the order is correct in so far as it states that no negligence of the driver may be imputed to the two occupants of the farm truck so as to bar recovery on behalf of the latter. However, since we have held as a matter of law that, for the reasons above stated, appellants were not negligent, there is nothing upon which to base a recovery in any event. Paragraph 4 of the order does not state a reason sufficient to sustain the granting of new trials to

respondents in their respective actions for the deaths of Patricia Lakoduk and Robert Miller.

In view of the reasons hereinabove given, it is unnecessary to consider the other reasons recited by the trial court in support of the order. Likewise, due consideration of the remaining points discussed in respondents' brief in support of the court's order discloses that they are without merit.

 We have not overlooked respondents' motion to strike that portion of appellants' brief numbered VI on the ground that appellants have failed to comply with that portion of Rule on Appeal 43, 34A Wn. (2d) 47, as amended, effective January 2, 1953, which reads as follows:

"No error assigned to the inclusion, omission, sufficiency, or insufficiency of an instruction or instructions, given or not given, will be considered unless such instruction or instructions, as the case may be, shall be set out in the brief in full."

This rule relates to cases where the giving of instructions, or the refusal to give requested instructions, has been assigned as error in appellants' brief. The rule does not relate to cases when the only assignment of error is that the trial court erred in granting a motion for new trial. The assignments in this case require us to review the legal sufficiency of the reasons stated in the trial court's order for granting respondents' motions for new trials.

Respondents' motion to strike the portion of appellants' brief above indicated is therefore denied.

Respondents have filed a motion to substitute Vida L. Beck, administratrix, as appellant in lieu of Robert Beck, who died on August 28, 1955, during the pendency of his appeal in this court. Appellants resist this motion, and have moved the action be abated as to Robert Beck on the ground that the provisions of RCW 4.20.045 (which became effective June 10, 1953), relating to the survival of tort actions, have no application to this case because the accident here involved happened prior to the effective date of the act.

In view of the conclusion that we have reached on the merits with respect to the liability of appellant Cruger, to wit, that the order granting the new trials was erroneously

entered, we do not deem it necessary to pass upon appellants' motion to abate these suits as to Robert Beck.

The motion to substitute the legal representative of Robert Beck as a party appellant in these cases is granted.

The order granting the new trials in these three cases having been erroneously entered, it is hereby reversed as to both appellants, with instructions to enter a judgment dismissing each of the three actions.

It is so ordered.

HAMLEY, C. J., SCHWELLENBACH, FINLEY, and OTT, JJ., concur.

